UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SGM HOLDINGS LLC, SYNDICATED GEO
MANAGEMENT CORPORATION, RICHARD
FEATHERLY, LAWRENCE FIELD, and PREMIER
NATURAL RESOURCES LLC,

                     Plaintiffs,

                     v.

A. JAMES ANDREWS, RICHARD GAINES, and KARL
SCHLEDWITZ,

                     Defendants.

15 Civ. 8142 ()

**COMPLAINT**

---

       Plaintiffs SGM Holdings LLC ("SGM"), Syndicated Geo Management Corporation

("Syndicated Geo"), Richard Featherly, Lawrence Field, and Premier Natural Resources LLC

("Premier") (collectively, "SGM Parties"), by and through their undersigned attorneys,

respectfully allege as and for their Complaint against defendants A. James Andrews, Richard

Gaines, and Karl Schledwitz (collectively, "Counsel") as follows:

**Nature of the Complaint**

       1.      SGM Parties seek recovery of all damages they have suffered, trebled pursuant to

N.Y. Judiciary Law § 487, on account of the multiple knowingly false, deceptive, and fabricated

factual allegations set forth by Counsel in pleadings and papers they wrote and filed with this

Court on behalf of the plaintiffs in a putative class action captioned DNV Investment

Partnership, et al. v. SGM Holdings LLC, et. al, No. 15 Civ. 1255 (PAC) (S.D.N.Y.) ("DNV v.

SGM").

       2.      DNV v. SGM is a strike suit, predicated on multiple knowingly false and

deceptive factual allegations, brought by Counsel on behalf of named plaintiffs, sophisticated

investors who made speculative investments as passive limited partners ("Passive Investors") in a fund named Metropolitan EIH13 L.P. ("MET13"), and a putative class of these Passive Investors. MET13, in turn, had been formed by Metropolitan Equity Partners L.L.C. ("MEP") with the express disclosed purpose of making speculative indirect investments in oil and gas ventures in Ohio (the "Oil and Gas Transactions").

3.      Counsel made all of these multiple knowingly false allegations in filed pleadings and papers, creating a "conspiracy" out of thin air, and with constantly changing members, in an attempt to deceive the Court as to the merits of the claims Counsel asserted on behalf of Passive Investors, plaintiffs in DNV v. SGM, and the putative class of plaintiffs in that lawsuit, who are also passive limited partners holding Class A membership interests in MET13.

4.      Aside from multiple factual inaccuracies that will be addressed below, Counsel know that two of the parties that it named as defendants in DNV v. SGM, Syndicated Geo and Premier, had absolutely no involvement with the Oil and Gas Transactions. Nonetheless Counsel made and are making false, baseless, and fictional factual allegations against Syndicated Geo and Premier in an attempt to deceive the Court and to create a claim where none exists, resulting in harm and damages to Syndicated Geo and Premier.

5.      Counsel know that the claims brought against Premier and Syndicated Geo are false, fictitious, and meritless, because Counsel know that: neither Premier nor Syndicated Geo ever performed services for MET13 or Passive Investors; neither Premier nor Syndicated Geo contracted to sell oil and gas assets to MET13 or Passive Investors; and neither Premier nor Syndicated Geo was a party to any of the Oil and Gas Transactions. Counsel also know or should have known that Syndicated Geo did not even have any involvement in any oil and gas ventures after June 2011, approximately six months before Passive Investors purchased their Class A

limited partnership interests in MET13; and Counsel know that Premier never provided any services to MET13 or Passive Investors.

6.      Counsel also know that not one of the five SGM Parties was in privity with Passive Investors; that four of the five named SGM Parties had no communications with Passive Investors, and the fifth, Mr. Field. is only alleged to have had telephone calls with a minority of the Passive Investors; and that Passive Investors represented and agreed in writing that they had not relied on any oral representations when they purchased their Class A limited partnership interests in MET13.

7.      Counsel also know that SGM itself is one of the largest Class A limited partners in MET13, holding a $2.5 million limited partnership interest; that MEP and other persons associated with MEP and its management are also Class A investors in MET13; and MEP, MET13, and their affiliates and subsidiaries had  provided a global general release to SGM Parties that covers everything relating to the Oil and Gas Transactions.

**Jurisdiction**

8.      The Court has personal jurisdiction over Counsel because each of them has appeared in this Court, and each of them has committed a tort in New York by virtue of their violations of N.Y. Judiciary Law § 487, including by knowingly filing multiple pleadings and papers in this Court in DNV v. SGM containing multiple factually false statements so as to create meritless claims and so as to deceive the Court, including by asserting claims against two entities, Syndicated Geo and Premier, who were not involved in any of the relevant transactions, as well as by knowingly pleading multiple falsehoods as to all of the SGM Parties.

9.       The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiffs, SGM Parties (who are citizens of Delaware,

Michigan, Oklahoma, Virginia, and Texas) and Counsel (who, on information and belief, are all Tennessee citizens); and the amount in controversy exceeds $100,000.

**Parties**

10.    Plaintiff SGM Holdings LLC is a Delaware limited liability company. SGM's entire membership consists of natural persons resident in Michigan.

11.    Like Passive Investors, SGM is a Class A investor in MET13; SGM holds a $2.5 million passive limited partnership interest.

12.    Plaintiff Syndicated Geo Management Corporation is a Virginia corporation, with a principal place of business in Grand Rapids, Michigan.

13.    Plaintiff Richard Featherly is a natural person resident in Michigan.

14.    Plaintiff Premier Natural Resources LLC is an Oklahoma limited liability company; Premier's entire membership consists of natural persons resident in Oklahoma and one person resident in Texas.

15.    Plaintiff Lawrence Field is a natural person resident in Oklahoma.

16.    For the avoidance of doubt, and in response to unfounded and false allegations asserted by Counsel in pleadings filed in DNV v. SGM, Mr. Field was not and has never been a "founder" or a "principal" of Premier. Nor did Mr. Field "control" Premier. He had no authority or apparent authority at Premier, and is not even a member of Premier.

17.    Defendant A. James Andrews is a natural person resident in Knoxville, Tennessee, and is admitted pro hac vice in this Court.

18.    Defendant Richard Gaines is a natural person resident in Knoxville, Tennessee and is admitted pro hac vice in this Court.

19.     Defendant Karl Schledwitz is a natural person resident in Memphis, Tennessee. Mr. Schledwitz has not applied for admission pro hac vice, but -- like Mr. Andrews and Mr. Gaines -- Mr. Schledwitz has submitted papers to this Court as counsel for Passive Investors, plaintiffs in DNV v. SGM.

**DNV v. SGM**

20.     DNV v. SGM is a putative class action alleging fraud in the sale of securities, violations of RICO, and conspiracy. Passive Investors and putative class members in DNV v. SGM are all Class A limited partners in MET13; Passive Investors all invested in MET13 in or about December 2011.

21.     MET13 was founded and managed by MEP.

22.     MEP also founded, owned, and controlled MET13's general partner, Metropolitan GP Holdings, LLC ("MET GP").

23.     MEP created a complicated ownership and financial structure by which MET13 indirectly invested in the Oil and Gas Transactions, by lending money at high rates of interest starting in 2012 to its controlled subsidiary, Reed Energy LLC ("Reed").

24.     In turn, Reed or its first or second tier subsidiaries, using the monies lent by MET13, acquired all of the Oil and Gas Transactions (leases, operating wells, etc.

25.     MEP received a fee to manage MET13, and a separate fee to manage Reed. MEP's founder and manager, Paul Lisiak, also was at all relevant times chairman of Reed.

26.      Counsel asserted claims against SGM Parties on behalf of Passive Investors in the amount of $82.29 million plus interest, inclusive of treble damages pursuant to RICO.

27.     In December 2011, when Passive Investors invested in MET13, MET13, Reed, and its subsidiaries, had no assets or operations.

28.     On or about January 4, 2012:

a.      MET13 entered into a secured non-revolving loan facility (the "Reed Loan Agreement") with Reed, pursuant to which MET13 could make loan advances to Reed for acquisitions approved by MET13, at a 20% rate of interest, together with other substantial fees payable to MEP for obtaining this loan. The Reed Loan Agreement initially was in the nominal amount of $27 million, although it was not fully funded until later.

b.      MEP entered into an agreement with Reed (the "MEP Fee Agreement"). Among the critical provisions, (i) Reed was to pay MEP $10,000 per month as a management fee to manage Reed, and (ii) Reed was to pay MEP a 2.5% fee on each advance made under the Loan Agreement. MEP also was to be paid an additional 2% fee from MET13 on each of those same advances under the Loan Agreement, in addition to MEP's other management fees (2% of amount invested, and 20% of profits) and the expenses that it charged to MET13.

c.      Regent entered into an agreement with Reed (the "Regent Fee Agreement") pursuant to which Regent was to be paid certain specified investment banking fees that Regent had previously earned, to be paid on a pari passu basis with fees paid to MEP, and Mr. Field traded a substantial portion of Regent's total investment banking fee for a 6% equity interest in Reed. Regent ultimately was not paid a substantial portion of its fees under the Regent Fee Agreement, even though MEP had received fees exceeding the amount that Regent was to have been paid.

d.      Reed entered into an option agreement to purchase certain rights to drill oil and gas wells starting at 2,500 feet below the surface ("Deep Rights").

29.     Counsel allege in the Second Amended Complaint they filed in DNV v. SGM ("Complaint," and "Compl. ¶ __" in citations) that the Oil and Gas Transactions consist of "Deep

Rights" acquired by Reed and the "Shallow Operation" acquired by Reed's subsidiary, North East Fuels, Inc. ("NE Fuels"). The "Shallow Operation" is defined in that Complaint as an operating oil and gas field acquired by NE Fuels from Mr. and Mrs. Bobby and Marjorie Anderson and/or Anderson Energy Inc. that consisted of shallow wells (less than 2,500 feet from the surface), tanks, and other drilling infrastructure. "Deep Rights" is defined in the Complaint as rights to drill deep oil and gas wells (i.e., the right to drill wells that were deeper than 2,500 feet from the surface) "in the Utica Shale, located below the Shallow Operation."

30.     These allegations in the Complaint about the Shallow Operation and the Deep Rights are inaccurate. Only about 10% of the approximately 35,000 acres of deep drilling rights eventually owned, leased, or controlled by Reed or its subsidiaries were located underneath the Shallow Operation, and a vast majority of the deep drilling rights were acquired by Reed from multiple different entities, including landowners and other oil and gas companies, and not the Andersons. Yet Counsel blame SGM Parties for all of these acquisitions.

31.     Further, the Shallow Operation was not purchased by NE Fuels. Rather, the Shallow Operations was an asset owned by NE Fuels. A subsidiary of Reed, NFI Acquisition Company Inc. (now known as Reed Energy Exploration Inc., or "NFI") acquired NE Fuels via a stock transaction.

32.     In the entirety of the 150 numbered (and 4 unnumbered) paragraphs of the Complaint, many of which contain multiple factual allegations, not a single factual allegation is made "on information and belief." Counsel not only know that multiple factual allegations are false, Counsel also are aware that they did not and do not have any factual basis for making multiple other factual allegations stated to be factual-- many of which are also false.

33.     The Passive Investors are sophisticated investors who state in the Complaint and in their MET13 subscription agreements that they invested in MET13 expressly on the basis of their review and reliance on MET13's private placement memorandum (the "Confidential Disclosure Memorandum," or "CDM") and their own due diligence.

34.     MEP acting on behalf of MET13 wrote and distributed MET13's CDM to Passive Investors prior to their investments; MEP was delegated the authority by MET13's general partner, MET GP, to be the Manager of MET13, and was responsible to perform due diligence on all investments by MET13.

35.     Counsel know that the MET13 limited partnership agreement ("MET13 LP Agreement") expressly provides that MET13 limited partners, such as Passive Investors, acting that capacity were excluded from any management role or managerial authority over MET13.

36.     Counsel also know that: As Manager, MEP had management authority over MET13; MEP as Manager was authorized under the MET13 LP Agreement to create additional classes of limited partner investors in MET13, thereby diluting the Class A investors; and that MEP also was authorized under the MET13 LP Agreement to provide those additional classes with senior rights over Class A investors.

37.     MEP subsequently created Class B and Class C limited partnership interests in MET13; Class B and C investors were, like Class A investors, passive investors with no management rights. Class C limited partners were senior in priority to Class A and B members. Class B and C were created after November 30, 2012.

38.     Counsel have copies of a Global Settlement Agreement entered into on November 30, 2012 (as amended December 1, 2012) between MET13, MEP, and all affiliates, and SGM and Mr. Featherly. Counsel are aware that the Global Settlement Agreement provided general

releases to SGM, Mr. Featherly, and all of their agents, and all entities acting in concert with any of the foregoing, including all SGM Parties, including for all matters relating to MET13 and the Oil and Gas Transactions.

39.     Counsel are attorneys for Passive Investors, plaintiffs in <u>DNV v. SGM</u>. In the third version of the complaint in <u>DNV v. SGM</u>, i.e., the (Second Amended) Complaint, Counsel assert to this Court that SGM Parties (SGM, Syndicated Geo, Premier, Mr. Featherly, and Mr. Field) formed a criminal conspiracy, conspired to commit fraud, and committed fraud in connection with the sale of securities, and formed a RICO Enterprise and committed and conspired to commit civil and criminal RICO violations in connection with the sale of securities, i.e., the Class A limited partnership interests in MET13 owned by Passive Investors.

40.     Counsel know that SGM is one of the largest Class A investors in MET13, holding a $2.5 million interest.

41.     In the initial complaint that they filed in <u>DNV v. SGM</u>, Counsel sought substantially the same relief, but claimed that the five supposed conspirators were Premier, Mr. Field, Charles Stephenson, Regent Private Capital LLC ("Regent") and Regent Private Capital II LLC ("Regent II"). Counsel neither sued SGM, Syndicated Geo, or Mr. Featherly, nor made any allegations about them in that initial complaint.

42.     In the two subsequent iterations of the complaint in <u>DNV v. SGM</u>, Counsel dismissed three entities Counsel originally claimed were co-conspirators, Mr. Stephenson, Regent, and Regent II, but added three new supposed conspirators as defendants: SGM, Syndicated Geo, and Mr. Featherly.

43.     Despite having replaced a majority of the members of the supposed conspiracy, and despite the absence of any factual support, Counsel persist in alleging the existence of this supposed conspiracy to defraud Passive Investors.

44.     The claims Counsel asserted on behalf of Passive Investors in <u>DNV v. SGM</u>, including the claims of a "conspiracy" to defraud, are false, and based on multiple knowingly false factual allegations that Counsel refused to correct and continue to represent to the Court to be true, even though Counsel possessed and possess conclusive documentation and knowledge that these factual allegations are false.

**Counsel's Pattern of Suing Entities Who Had**
**No Involvement in the Oil and Gas Transactions**

45.     Three of the five defendants that Counsel initially sued in <u>DNV v. SGM</u>, Mr. Stephenson, Premier, and Regent II, had no involvement whatsoever in any of the Oil and Gas Transactions.

46.     In the second and third iterations of the complaint in <u>DNV v. SGM</u>, Counsel continue to sue Premier, and have added another defendant, Syndicated Geo, which also had absolutely nothing to do with any of the Oil and Gas Transactions entered into by MET13.

47.     Premier and Syndicated Geo are only defendants in <u>DNV v. SGM</u> because of Counsel's knowing fabrication and inclusion of false allegations, submitted in an attempt to deceive the Court and to avoid summary dismissal.

48.     In particular, Counsel know that all of their multiple factual allegations, and accusations of fraud, RICO violations, and conspiracy as against Premier are false, baseless, and fictional.

49.     As Counsel know, Premier never performed services for MET13 or its affiliates, never contracted with MET13 or its affiliates, and was not a party to any of the Oil and Gas Transactions.

50.     Counsel also vaguely allege that Premier "aided and abetted" other named defendants in DNV v. SGM, and that three of the SGM Parties, including Premier, allegedly were supposed to have provided services to Reed. All of those allegations are false.

51.     Counsel know that Premier provided no services to Reed (or to Passive Investors). And, in any event, Counsel knows that Passive Investors lack standing to assert claims belonging to MET13, let alone claims belonging to Reed.

52.     On information and belief, Counsel included these false allegations about Premier's conduct in the Complaint in an attempt to keep Premier as a defendant in the DNV v. SGM action, despite the fact that Counsel know that Premier simply had no involvement in the Oil and Gas Transactions.

53.     Counsel also seek to involve Premier by falsely alleging that Mr. Field was "one of the founders and principals in Premier Natural Resources." The allegation is false and baseless.

54.     Counsel had no factual basis or reasonable reason to believe that Mr. Field was a founder or principal in Premier.

55.     Mr. Field was not an officer, manager, member, founder, or principal in Premier. Nor did Mr. Field have actual or apparent authority to bind Premier.

56.     On information and belief, Counsel conducted basic due diligence, and know that Mr. Field was not a founder or principal in Premier, not least because: (a) the Executive Management of Premier is listed in Premier's website, and Mr. Field has never been listed in the

Premier website in any capacity, let alone as founder, manager, officer, or Executive Management (see www.premiernaturalresources.com), and (b) Premier's website, as well as all publicly available information relating to Premier, all consistently provide that all of the founders and members of Premier were formerly employed at Vintage Petroleum Inc. -- and Mr. Field was never employed at Vintage Petroleum in any capacity.

57.     Counsel also know Passive Investors (let alone MET13) have no claims against Premier, and that Premier never performed services for, never made any representations to, and never contracted with Passive Investors.

58.     Counsel's claims against Premier are knowingly false, and intended to deceive the Court.

59.     Similarly, Counsel's claims against Syndicated Geo are also knowingly false, and intended to deceive the Court.

60.     Syndicated Geo did possess a contract for various oil and gas rights in early 2011. But that contract expired in April 2011, and Syndicated Geo was no longer involved in any oil and gas transactions of any sort after June 2011. On information and belief, Passive Investors only invested in December 2011.

61.     Syndicated Geo, like Premier, was never a party to any Oil and Gas Transactions.

62.     Nor is there a separate basis for Counsel to assert claims on behalf of Passive Investors as against Syndicated Geo.

63.     Syndicated Geo never performed services for, never made any representations to, and was never a party to any Oil and Gas Transactions with Passive Investors.

64.     Counsel's claims against Syndicated Geo are knowingly false, and intended to deceive the Court.

**The RICO Enterprise Supposedly "Memorialized" in an
Irrelevant Letter Agreement Not Signed by Four of the SGM Parties**

65.     Counsel attempt to create a conspiracy and RICO Enterprise involving all of the SGM Parties by mischaracterizing a a two-page agreement dated March 1, 2011 by and between Regent and Syndicated Geo, and no other entity ("Regent/Syndicated Geo letter agreement"). (Compl. Ex. A.)

66.     Counsel falsely allege that the Regent/Syndicated Geo letter agreement "memorializes" a RICO Enterprise. (Compl. ¶ 29.)

67.     Counsel repeatedly, knowingly, and falsely allege that each of the SGM Parties was a party to the Regent/Syndicated Geo letter agreement, in part by seeking to confuse Syndicated Geo with SGM.

68.     Counsel also argue that all SGM Parties supposedly have liability because Regent and other SGM Parties purportedly did not reveal Regent's agency relationship with Syndicated Geo to MEP or MET13. All of these allegations are knowingly false.

69.     The facts are simple and beyond dispute. In early 2011, Syndicated Geo was seeking additional capital to assist it in developing certain oil and gas assets that it had contracted to buy. Syndicated Geo retained Regent to act as its agent to seek a bridge loan to develop the oil and gas assets. This retention was memorialized by Regent in the Regent/Syndicated Geo letter agreement.

70.     Thereafter, Regent approached multiple potential lenders, including MEP, seeking a bridge loan for Syndicated Geo.

71.     Regent and Syndicated Geo never obtained a bridge loan on acceptable terms from any of the potential lenders.

72.     In April 2011, Syndicated Geo's purchase contract for the oil and gas properties expired, and the properties reverted to the erstwhile seller.

73.     Syndicated Geo did not pay anything to Regent, including pursuant to the Regent/Syndicated Geo letter agreement, or otherwise.

74.     Regent did not pay anything to Syndicated Geo, including pursuant to the Regent/Syndicated Geo letter agreement.

75.     MEP and MET13 did not pay anything to Syndicated Geo.

76.     Syndicated Geo permanently terminated any further involvement in any aspect of the oil and gas business by in or about June 2011.

77.     Passive Investors did not invest in MET13 until in or about December 2011.

78.     MET13 was not active, did not engage in business (other than to obtain the capital contributions from limited partners in December 2011), and did not have any investments or operations until on and after January 4, 2012 -- after Passive Investors and the putative class had invested in MET13.

79.     Syndicated Geo never entered into any contract with any of the Passive Investors.

80.     Syndicated Geo never entered into any contract with MEP, MET13, MET GP, Reed, or any of their respective affiliates.

81.     Syndicated Geo never made any representation to Passive Investors in connection with their investment in MET13.

82.     Syndicated Geo never had any relationship with Passive Investors, let alone a confidential relationship.

83.     Syndicated Geo owed no duties to Passive Investors.

84.     Syndicated Geo never sold any assets to Passive Investors.

85.     Despite knowing all of the foregoing facts, Counsel caused Passive Investors to sue Syndicated Geo, and rejected and opposed all efforts and requests and motions seeking to have Syndicated Geo dismissed from the action.

86.     Counsel's argument that the Regent/Syndicated Geo letter agreement "memorializes" a RICO Enterprise by all of the SGM Parties (Compl. ¶ 29) presents Counsel with a serious logical problem: the Regent/Syndicated Geo is by and between two entities, only, of which one (Regent) is not named as a defendant in <u>DNV v. SGM</u>, and the other (Syndicated Geo) had no involvement in the Oil and Gas Transaactions

87.      Despite knowing that the sole parties to the Regent/Syndicated Geo letter agreement are Regent and Syndicated Geo, Counsel repeatedly make false allegations in the pleadings and in papers, misstating the parties to the Regent/Syndicated Geo agreement.

88.     Counsel variously allege that the parties to the Regent/Syndicated Geo letter agreement were "Mr. Field, on behalf of Regent, and Mr. Featherly, on behalf of Syndicated Geo Management, Inc. and SGM" (Compl. ¶ 16); "SGM and Regent" (<u>id.</u> ¶ 28); "Regent and Featherly/SGM]" (<u>id.</u> ¶ 36 (also falsely alleging that Mr. Field had an "undisclosed 'stake in the venture'")); Field and Regent (<u>id.</u> ¶ 40); "Defendants'/Enterprise" (<u>id.</u> ¶ 65); "Defendants" and "SGM" (<u>id.</u> ¶ 110); "SGM" and "Defendants" (<u>id.</u>); "Field and Featherly" (<u>id.</u> ¶ 118); and "between Featherly/SGM and Field/Regent (aided and abetted by Premier)" (<u>id.</u> ¶ 119).

89.     Of course, SGM was not a party to the Regent/Syndicated Geo agreement -- as Counsel know. And, on information and belief, Counsel also know that SGM was not even in existence on March 1, 2011, which is the date of the Regent/Syndicated Geo letter agreement.

90.     Counsel nonetheless knowingly confuse and conflate Syndicated Geo with SGM Holdings LLC throughout the Complaint, in an apparent effort to create a claim, and to deceive the Court.

91.     Counsel falsely and deceptively allege that SGM Holdings LLC was doing business as Syndicated Geo (Compl. ¶ 10) and that, "[i]n 2009, SGM Holdings LLC ('SGM'), an entity formed by Syndicated Geo Management, Inc., obtained an option in what was purported to be 171 shallow gas wells (the 'Shallow Operation') . . . ." (id. ¶ 26).

92.     On information and belief, Counsel make allegations as to conduct by SGM in 2009 despite knowing that SGM was not in existence in 2009.

93.     On information and belief, Counsel claims that SGM was a party to the Regent/Syndicated Geo letter agreement despite knowing that SGM was not in existence on March 1, 2011.

94.     Counsel also knowingly and falsely allege that SGM was a party to the Regent/Syndicated Geo letter agreement. (Compl. ¶¶ 16, 28.)

95.     On information and belief, in an effort to further deceive the Court and to avoid dismissal of a meritless action, Counsel deliberately confuse and conflate the other entities referenced in the Complaint.

96.     Throughout the Complaint, Counsel falsely allege that the "Enterprise" made fraudulent misrepresentations or committed other acts of supposed misconduct, and/or that claimed misrepresentations or misconduct were made "on behalf of the Enterprise." (See Compl. recitals pp.1, 2 and ¶¶ 23, 29, 30, 32, 34, 42, 44, 48, 50, 51, 54-56, 57, 59, 62-65, 69, 71, 73, 74, 111, 116-18, 121, 122, 126-28.) On information and belief, Counsel make allegations about the

"Enterprise" and avoid making allegations with specificity against particular SGM Parties in an attempt to conceal the absence of a meritorious claim against any SGM Party.

97.    Counsel also falsely allege in the Complaint in <u>DNV v. SGM</u> that "Defendants" (or occasionally "Defendants/Enterprise" or "Enterprise/Defendants") made fraudulent misrepresentations and/or committed other acts of supposed misconduct. (<u>See</u> Compl. ¶¶ 13, 23, 24, 30, 36, 51, 55, 64, 65, 71, 73, 77, 80, 82, 83, 86-89, 91, 94, 100, 102, 106, 108, 110, 115-19, 121, 122, 128, 129, 135, 142, 143, 145, 147, 149.) On information and belief, Counsel make allegations about "Defendants" and avoid making allegations with specificity against particular SGM Party in an attempt to conceal the absence of a meritorious claim against any particular SGM Party.

98.    Counsel also deliberately conflate two, three, four, and five SGM Parties in the Complaint, alleging that misrepresentations supposedly were made by "Field/Regent" (Compl. ¶¶ 56, 199, 127); "Field and Regent" or "Regent and Field" (<u>id.</u> ¶¶ 85, 113, 134); "Field/Regent/Premier" (<u>id.</u> ¶¶ 111, 120); "Regent and Premier" (<u>id.</u> recitals p. 1, and ¶¶ 19, 27, 38, 41, 59, 61, 73); and "Featherly/SGM" (<u>id.</u> ¶¶ 36, 79, 111, 119, 126, 127).

99.    Counsel also use or define the term "Metropolitan" throughout the Complaint to refer to five different entities: MET GP (Compl. recitals); MEP (<u>id.</u> ¶ 20); MET13 (<u>id.</u> ¶¶ 51, 120, 110, 77); and "Reed" (<u>id.</u> ¶¶ 62, 65, 77) -- and Counsel define "Reed" to mean both Reed Energy LLC and Reed Energy Exploration Inc. (<u>id.</u> ¶ 20). Counsel, experienced class action lawyers, knew that these allegations were false and confusing, yet persisted in including them in three iterations of the complaint, so as to deceive the Court.

**Counsel Falsely Allege that Regent's Agency Relationship Was Unknown**

100.    Counsel seek to create a claim and to deceive the Court by falsely alleging that MET13 and MEP, as well Passive Investors, had no idea that Regent was Syndicated Geo's agent pursuant to the Regent/Syndicated Geo letter agreement; and that Regent and the SGM Parties supposedly failed to disclose and actively concealed the relationship between Regent and Syndicated Geo. (Compl. recitals pp. 1, 2 and ¶¶ 25, 32, 37, 40, 62, 65, 79, 111, 118-20.)

101.    In particular, Counsel falsely allege that, if MET13 had known about this investment banking relationship, MET13 would never have acquired the Shallow Operation, and Passive Investors would never have invested in MET13. (Compl. ¶¶ 119-21.)

102.    Counsel know that their allegations that MEP and MET13 did not know Regent was acting for Syndicated Geo are false.

103.    The PowerPoint presentation that Regent presented to MEP and other potential lenders when seeking a bridge loan for Syndicated Geo provides that "[Syndicated Geo] has partnered with Regent Capital . . . ." That presentation was exhibit 10 to the complaint in SGM Holdings LLC et al. v. Paul K. Lisiak, et al. (S.Ct., NY County No. 653676/2013) ( SGM v. Lisiak, a copy of which Counsel possessed before filing either the Amended Complaint or Second Amended Complaint in DNV v. SGM. (SGM v. Lisiak Compl. Ex. 10 at unnumbered p.13)

104.    Counsel also annex the CDM to the Complaint (Compl. Ex. D). On information and belief, Counsel knew that the Regent Fee Agreement was an exhibit to the CDM, and that therefore MET13 and MEP knew about Regent's agency relationship. Counsel also refer to fees payable under the Regent Fee Agreement in the Complaint.

105.     Yet Counsel nonetheless persist in falsely alleging that the Regent/Syndicated Geo agency relationship was not known to MET13.

106.     In short, Counsel simply made up "facts" to sue Syndicated Geo and Premier.

107.     Similarly, Counsel also made knowingly false allegations in pleadings in order to create claims against two additional parties, Mr. Featherly and SGM.

108.     Like Premier and Syndicated Geo, neither Mr. Featherly nor SGM ever spoke with Passive Investors, and neither Mr. Featherly nor SGM was ever in privity of contract with Passive Investors.

**The Global Settlement Agreement**

109.     In a Global Settlement Agreement dated November 30, 2012 (as amended December 1, 2012, the "GSA"), MET13; MEP; MET13; MET13's subsidiary Reed; Reed's subsidiary Reed Energy Exploration Company, Inc., then known as NFI Acquisition Company Inc. ("NFI"); NFI's subsidiary North East Fuels, Inc.; and their affiliates and certain officers issued broad general releases that, among other things, released SGM, Mr. Featherly, and their respective agents and all persons who had been acting in concert with any of them from any and all claims, including all claims relating to the Oil and Gas Transactions.

110.     As limited partners in MET13, Passive Investors are bound by the provisions of the GSA entered into by MET13 (and all of its affiliates) with SGM et al., as Judge Lipman held in her earlier Order applying the venue provisions of the GSA in transferring <u>DNV v. SGM</u> to this Court from Tennessee.

111.     In an attempt to avoid the GSA, the controlling decisions and orders issued by Justice Sherwood in <u>SGM v. Lisiak</u> enforcing and applying the GSA to MET13, and Judge Lipman's Order enforcing and applying the GSA, which also recognized Justice Sherwood's decisions upholding the validity of the GSA, Counsel allege that the GSA was entered into

"under duress from Featherly/SGM on behalf of the Enterprise" and that SGM was paid $1 million under the GSA. Counsel's allegations are false.

112.    Counsel's invention of "duress," which was not even asserted by MET13 or Reed or any of their affiliates in their earlier efforts to avoid enforcement of the GSA, is false and unfounded. Counsel have no basis to allege any "duress," nor was there any.

113.    Nor does Counsel have any basis to argue that Syndicated Geo, Mr. Field, or Premier, all members of the supposed Enterprise invented by Counsel, had any involvement in the negotiation of the GSA.  And they did not.

114.    Counsel falsely allege duress in an attempt to collaterally attack the GSA, and the decisions and orders of Justice Sherwood and Judge Lipman.

115.    Counsel persist in attacking the validity of the GSA even though (after Justice Sherwood issued his June 24, 2014 Decision and Order in SGM v. Lisiak), all parties to the GSA have agreed and filed pleadings expressly admitting that the GSA is valid and enforceable.

116.    Counsel's allegation that SGM was paid $1 million under the GSA is also false and wholly unfounded -- as Counsel know full well, since at all relevant times prior to and after making that allegations, Counsel had a copy of the GSA.

**Counsel's Allegation that Passive Investors Invested in Reliance on MET13's CDM Is Belied by the Contents of the CDM**

117.    Counsel allege that "[e]ach and every investor received and relied upon the Confidential Disclosure Memorandum in making the decision to invest in Met13." (Compl. ¶ 52.) Further, Passive Investors agreed in their subscription agreements that they had solely relied on the written representations in the CDM, and their own investigations, and did not rely on any oral representations in investing.

118.    This critical allegation about Passive Investors' reliance on MET13's private placement memorandum, the CDM, is logically inconsistent with the claims that Counsel assert on behalf of Passive Investors as against SGM Parties, since the CDM barely mentions most of the SGM Parties.

119.    Premier is nowhere mentioned in the CDM.

120.    Syndicated Geo is nowhere mentioned in the CDM.

121.    Lawrence Field is nowhere mentioned in the CDM.

122.    The name "Richard Featherly" appears twice: The CDM provides that Reed Energy LLC would be governed by a Board consisting of Paul Lisiak, Jason Henthorne, Richard Featherly, and Kenneth T. Hern; the CDM also provides that Mr. Featherly was one of the two leaders of SGM.

**The Diligence for the Shallow Operation**

123.    After SGM Parties moved to dismiss the complaint in DNV v. SGM for, among other things, lack of standing, owing to the absence of direct injury, Counsel modified the claims, and stated that Passive Investors have no claims for anything that occurred after they invested in or about December 2011.

124.    Instead, Counsel seek to blame the SGM Parties for due diligence on and the purchase of the Shallow Operation. As Counsel know, however, the Shallow Operation was not acquired until April 2012; even though SGM Parties were not responsible for that due diligence, the diligence was performed after Passive Investors had invested, not before.

125.    Similarly, Counsel also blame the SGM Parties for Reed's purchase of deep drilling rights. Again, the Deep Right were all purchased in and after 2012.

126.    In apparent recognition that the absence of a single reference to Premier in the CDM is a serious and perhaps fatal blow to their theory that Premier had any involvement or that

21

Premier defrauded them, Counsel falsely allege that <u>MET13's</u> representation in the CDM that "diligence" on the Shallow Operation was performed "in conjunction with industry experts" was a reference to Premier. (Compl. ¶ 61, referencing <u>id.</u> ¶ 60.)

127.    Of course, as the CDM provides, its summary of contractual provisions in other documents is not intended to be complete, and does not in itself create any liability. But Counsel's allegations are also baseless because Premier had no contract or obligation to conduct due diligence, and in fact Counsel are deliberately and deceptively deleting key words from the quotation from the CDM.

128.    Specifically, in quoting this passage from the CDM, Counsel deliberately deleted three critical words from the quotation, in an evident attempt to deceive the Court. The quoted selection from the CDM discusses "<u>General Partner's diligence</u> in conjunction with industry experts  . . . ." (Compl. Ex. D, CDM at 1.) "General Partner" is defined in the CDM as MET GP. Not Syndicated Geo, Premier, or any other SGM Party.

129.    Counsel know that Premier did not contract or agree to conduct expert due diligence, or provide any other services to MET13 or MET GP or any other relevant entity.

130.    Counsel also know all of the "industry experts" who later assisted MEP, as Manager of MET13 (and Reed) in due diligence. These experts were: (i) Jason Henthorne, an expert petroleum geologist who ran his own company, Petro Evaluations, was a Board member of Reed; and was part of the Management Team at MEP, all as set forth in the CDM; (ii) John T. Boyd Company, an independent consultant retained by one of the members of the putative class of Class A investors in MET13; the Boyd Report was was issued in late 2011 to MEP and Reed and MET13, at or before the time Passive Investors had invested (and Mr. Featherly and SGM only received a copy of the Boyd Report in 2012, after Passive Investors had invested)); (iii)

Hefcorp-jon, another independent consultant, whose report subsequently was reviewed and updated by a licensed petroleum engineer, Thomas E. Suhy; and most importantly, (iv) TEEMCO LLC, which prepared a Phase I Environmental Site Assessment (the "TEEMCO Report"), a 650-page document that reviews and analyzes every single well in the Shallow Operation and sets forth the missing wells, and the environmental problems with each well, which report is specifically incorporated by reference in the Complaint, and which report again was received and reviewed by MET13, MEP, and their affiliates at or before the time Passive Investors invested.

131.    MEP itself and its managers relied on these expert reports and their own due diligence, performed by Jason Henthorne, an experienced oil geologist and former two-term president of the Ohio Geological Society. Mr. Henthorne also had experience as a businessman, who reportedly had made millions of dollars acquiring and selling oil and gas assets similar in asset type to those acquired by MET13.

132.    Based on his due diligence, Mr. Henthorne invested in MET13 as a Class A investor in MET13.

133.    Mr. Henthorne also provided a general release to SGM Parties in the GSA.

134.    MEP, the Manager of MET13, also invested as a Class A investor in MET13 (along with another fund founded and managed by MEP). In addition, various members of MEP's senior management, or their families, including Paul Lisiak (through his brother), Fred Ganning (directly), Miles Peet (through a family trust), and Jason Henthorne (directly) also were Class A investors in MET13.

135.    Counsel know that due diligence was conducted by Mr. Henthorne, JT Boyd, and Hefcorp-jon and Mr. Suhy because Reed so alleges in its complaint in federal court. (See Reed v.

23

Regent, No. 13 Civ. 6656 (SDNY), Reed Compl. ¶¶ 57, 58, 85) and the substantially similar complaint that Reed brought in state court.

136.   Counsel know the contents of the Reed v. Regent complaint, because many of the factual allegations made by Counsel in the DNV v. SGM action are copied, in many cases word-for-word, from the factual allegations contained in the Reed v. Regent complaint.

137.   Counsel also know that both of the two Reed v. Regent complaints (in state and federal court) were voluntarily dismissed by Reed, et al., and therefore "adjudicated on the merits." (Fed. R. Civ. P. 41(a)(1)(B).)

138.   Yet Counsel persist in making false factual allegations that were asserted in Reed v. Regent, without any other factual basis, and despite knowing of the falsity of the allegations.

139.   For example, Counsel are personally familiar with the most important due diligence report, the 650-page TEEMCO Report.

140.   In April 2014, SGM Parties' counsel provided Mr. Andrews, lead Counsel, with a copy of the 650-page TEEMCO Report. In response, Mr. Andrews provided SGM Parties' counsel with a very slightly different (and longer) version of the very same TEEMCO Report, which Counsel already had in their possession. The longer version of the TEEMCO Report varied only slightly, in that it had some additional pages on TEEMCO's due diligence on a limited number of oil and gas wells located in West Virginia that are not at issue here and which were never acquired; TEEMCO's conclusions and analyses as to the Ohio oil and gas wells involved in the Oil and Gas Transactions are identical in both versions of its report.

141.   The TEEMCO Report provides detailed information about the Shallow Operation, including hundreds of pages of color photographs of all of the tanks and gas wells. The photographs document old and rusting equipment, abandoned wells, oil contamination, and leaks

around wells. The TEEMCO Report also features color maps and diagrams of multiple wells that were located too close to homes, roads, or water sources. The TEEMCO Report also contains summary tables well-by-well for 141 of 173 wells that were supposed to have comprised the Shallow Operation, detailing (i) what TEEMCO found about each of the wells, including listing multiple environmental and regulatory problems well-by-well; and (ii) a separate table listing 32 wells (out of 173) that TEEMCO advised that it could not find either by TEEMCO's physical inspection of the designated well sites and surrounding properties, or by reviewing public records and environmental databases.

142.    Counsel were advised and know that Mr. Lisiak, on behalf of MET13, MEP, and Reed, and their affiliates, had received and reviewed the TEEMCO Report in December 2011; and that MET13, MEP, and Reed (and their affiliates) so admitted in the answers that they filed in SGM v. Lisiak, et al. (Sup. Ct., N.Y. County No. 653676/2013) ("SGM v. Lisiak")

143.    In short, the problems with the Shallow Operation were known by MET13 before or contemporaneously with the time Passive Investors invested, and many months before NFI purchased NE Fuels.

144.    Yet, despite knowing that the TEEMCO Report disclosed 32 "missing" wells, and numerous environmental problems to MET13 long before any investment in the Shallow Operation, Counsel falsely claim that Mr. Henthorne only found in December 2012, eight months after the Shallow Operation was purchased, that there were 20 missing wells, and environmental problems with the Shallow Operation. (Compl. ¶ 96.)

145.    Counsel knew that these allegations were false or at best misleading, since these problems were fully disclosed and known to MET13 and MEP in late 2011, at or before the time

Passive Investors invested, and many months before the Shallow Operation was acquired in April 2012.

146.   Lest this have been overlooked by Counsel, Counsel were specifically advised before filing the Amended Complaint in <u>DNV v. SGM</u>, let alone the Second Amended Complaint, that the missing wells and other environmental problems alleged in their pleadings to have been concealed by SGM Parties, were fully disclosed in the TEEMCO Report.

147.   Yet, Counsel knowingly continued to include false allegations about the Shallow Operation, the known missing wells, and the supposed misconduct by SGM Parties, in each of the three iterations of the complaint, including the Second Amended Complaint filed in this Court.

148.   Counsel also know that the Shallow Operation was not purchased until April 2012, following due diligence by MEP, Reed, and NFI, and review of the TEEMCO Report, and that the price of the Shallow Operation was re-negotiated and reduced from $8 million to $3 million. (Compl. ¶ 100.)

149.   Nonetheless, Counsel falsely blame SGM Parties for the purchase of the Shallow Operation.

150.   Counsel also falsely argue in the pleadings that that Passive Investors "now bear responsibility" for the wells in the Shallow Operation (Compl. ¶ 107); that "[Passive Investors] and class members may face litigation in the future involving the cost associated with plugging the worthless wells" (<u>id.</u> ¶ 109); and that they "now face a bill of approximately $2.5 to $3 million to plug unproductive wells and clean up the played out oil field" (<u>id.</u> ¶ 121). All of these allegations are meritless, as Counsel know.

151.     Counsel know that Passive Investors have no management rights in MET13, a limited liability company, and no liability for current obligations of MET13 -- let alone for hypothetical future obligations of MET13's <u>third-tier</u> subsidiary, NE Fuel, which is the entity that owns the assets of the Shallow Operation.

152.     Despite this, Counsel falsely, knowingly, and deceptively claim that Passive Investors face a bill of $2.5 to $3 million to plug and clean-up the Shallow Operation.

153.     Counsel also, on information and belief, are aware or should be aware that Mr. Featherly tried to persuade Mr. Lisiak and MEP to direct Reed to purchase other assets more likely to result in greater rates of return than would be obtained even at the reduced $3 million purchase price for the Shallow Operation. Mr. Lisiak and MEP disregarded Mr. Featherly's advice, and demanded that the Shallow Operation be purchased.

**<u>SGM and Mr. Featherly</u>**

154.     Counsel filed claims against SGM and its manager, Mr. Featherly, despite knowing that there is no privity between SGM or Mr. Featherly and Passive Investors; despite knowing that neither SGM nor Mr. Featherly owes any duty to Passive Investors; and despite knowing that neither SGM nor Mr. Featherly made any misrepresentation to Passive Investors.

155.     Mr. Featherly never entered into any contract with Passive Investors.

156.     SGM never entered into any contract with Passive Investors.

157.     Counsel do not even allege that SGM or Mr. Featherly made any misrepresentation to Passive Investors.

158.     After Passive Investors invested, Mr. Featherly did serve as president of Reed, with strictly limited powers that could only be exercised with Reed Board approval. Any obligations or duties that Mr. Featherly incurred thereby were owed to Reed, not to Passive Investors, and were discharged and released by virtue of the general releases provided by Reed,

NE Fuels, MET13, MEP, and affiliates to SGM and Mr. Featherly (and all of their agents and all persons working in concert with them) in the GSA.

159.    Counsel have failed to articulate any factual basis to sue SGM or Mr. Featherly, or even to set forth any specific meritorious allegation about any supposed wrongful conduct by SGM or Mr. Featherly -- as opposed to sweeping, vague allegations about "Defendants" or "Enterprise."

160.    Further, Counsel are aware, at minimum from the CDM and the GSA, that SGM viewed MET13 to be valuable, since SGM owned 40% of Reed which it later traded in the GSA for its Class A limited partnership interest in MET13 valued at $2.5 million.

161.    On information and belief, no Passive Investor or any member of the putative class in the DNV v. SGM action spoke with SGM, Syndicated Geo, Mr. Featherly, or Premier prior to (or even after) Passive Investors invested.

162.    Only a minority of the Passive Investors spoke with Mr. Field before investing, and the putative class action is not predicated on each member of the class having spoken with Mr. Field.

**Mr. Field**

163.    Counsel falsely allege that Mr. Field represented to "Metropolitan" that he would attract and supervise service providers for the Shallow Operation. (Compl. ¶ 33(a).) In fact, Mr. Field never agreed or otherwise contracted to provide such service. And, of course, MET13 and all of the other entities defined as "Metropolitan" by Counsel signed the GSA, releasing any claims that they might have had against Mr. Field.

164.    Counsel falsely allege that Mr. Field represented that he would attract "top tier purchasers for a quick sale of the Deep Rights" (Compl. ¶ 33(b)) and that Mr. Field and SGM Parties failed to "produce[] a single potential buyer for Deep Rights. The best they have been

able to do is to produce a list of energy companies identified through the kind of internet search anyone could do" (id. ¶ 86).

165.    Counsel know that these claim are meritless: Counsel is aware of multiple offers for various properties in the Deep Rights, all at prices higher than the prices at which the Deep Rights were acquired. Counsel was provided a list of these purchase offers; Passive Investors were sent "investor updates" by MET13 referencing the purchase offers; and Counsel know that SGM was given a substantial commission last year in accordance with the SGM Fee Agreement and the GSA, for SGM having found a purchaser who purchased certain of the Deep Rights from Reed -- for a price higher than Reed had paid for those Deep Rights.

166.    Counsel claim that Mr. Field and Regent knew that the contemplated oil and gas investments by Reed and its affiliates supposedly were "worthless." (Compl. ¶ 85 (Deep Rights are "worthless"); ¶ 107 (wells in Shallow Operation are "worthless").) Yet Counsel allege that Mr. Field traded an investment banking fee for a minority 6% interest in Reed (id. ¶ 75) and Counsel know that SGM held a 40% interest in Reed until trading that interest for a $2.5 million Class A passive investment in MET13, as part of the GSA. Either way, if SGM and Mr. Field believed that the oil and gas interests that Reed purchased were "worthless" they would not have taken an interest in Reed -- or even in MET13, since MET13's sole assets were its loans to and equity interest in Reed.

167.    In an attempt to blame Mr. Field for any alleged errors in MET13's private placement memorandum, Counsel falsely allege that Mr. "Field also read and approved of the Confidential Disclosure Memorandum ('CDM')." (Comp. ¶ 60.)

168.    Mr. Field never "approved" the CDM, nor did he have any authority to do so. As Counsel know, and state, "Met13 drafted its confidential offering." (Compl. ¶120; see also ¶ 51 (CDM was "generated" by "Metropolitan").)

169.    Counsel simultaneously argue that Mr. Field should be held responsible for oral statements he supposedly made to a minority of the Passive Investors in telephone conversations, and that the Passive Investors are suing as putative class representatives with claims typical of the entire putative class.

170.    Counsel also argue that Mr. Field has liability for these supposed representations, but that MEP, which made the conference calls and founded MET13, and MET13, whose securities supposedly were fraudulently promoted, supposedly have no liability.

171.    In particular, in the Complaint, Counsel reach out to assert that "Plaintiffs [Passive Investors] specifically acknowledge that Metropolitan did not commit any fraudulent actions in the solicitation of funds for and the establishment of Met 13" (Compl. ¶ 130). In papers filed with the Court, Counsel state that Lisiak is "an innocent party"; and **"[t]o the Plaintiffs' knowledge**, the entity offering the limited partnership (Metropolitan Equity Partnership) interest was a victim, not a perpetrator or co-conspirator in the frauds." (Emphasis supplied.)

172.    Counsel's statement that Passive Investors have "knowledge" that MEP was not a perpetrator or co-conspirator is belied by the fact that MEP placed the calls objected to by Counsel. It is also logically inconsistent with Counsel's argument to this Court that the Complaint should not be dismissed because, supposedly, Counsel was precluded from obtaining necessary information from MEP.

173.     In short, Counsel argue to the Court that they have knowledge, i.e., can prove a negative -- the absence of any misconduct by MEP or MET13 -- while they simultaneously claim that they need discovery to prove or support their affirmative allegations as against SGM Parties.

174.     Counsel falsely blame SGM Parties for, among other things, all of the content of the CDM, which was written and published by MET13 and MEP -- but repeatedly emphasize that MET13 and MEP have no liability for the CDM that they wrote and published.

175.     Counsel simultaneously and inconsistently argue that (i) MEP and MET13 "raised other monies" (a total of $38 million, including Class A) (Compl. ¶ 107) that were used to purchase additional deep drilling rights, purchases that took place throughout 2012 and 2013; (ii) Passive Investors are junior to newer investors (id. ¶ 107); and (iii) in late March 2012 (id. ¶ 82), Jason Henthorne, on behalf of Reed and MEP and MET13, concluded that the Deep Rights "were essentially worthless and illiquid" (id. ¶ 85).

176.     Counsel blame SGM Parties for Reed's acquisition of oil and gas rights, and failure to sell all of those rights. Counsel do so despite knowing that MEP, as manager of Reed, caused Reed to acquire more than 35,000 acres of deep drilling rights, rather than the 15,000 acres that were contemplated in the CDM, most of which were acquired post-GSA, after SGM Parties had no further role in MET13 or Reed.

177.     Counsel also argue that Passive Investors will not be paid because senior classes of investors will be paid before Class A investors in MET13.

178.     Yet Counsel are aware that MEP created Class C (and Class B) classes of limited partners in MET13 after the November 30, 2012 GSA; and that MEP13 acquired much of the Deep Rights long after the November 30, 2012 GSA, pursuant to which SGM Parties were released of any claims, and resigned from any management authority over MET13 or Reed.

31

179.    Counsel also know that that there is no basis to sue the SGM Parties for "fraud" where Passive Investors allegedly incurred losses on what was expressly disclosed to Passive Investors as "highly speculative" investments (Compl. Ex. D, CDM at 20); where all Passive Investors had reviewed and invested based on the CDM (Compl. ¶ 52); where Passive Investors were all sophisticated investors who in their subscription agreements disclaimed reliance on any information other than the CDM and their own investigation, and the CDM provided Passive Investors with extensive disclosure of "Risk Factors" (Compl. Ex. D, CDM at 17-22) specific to the speculative oil and gas investments contemplated by MET13; where certain of the Class A investors commissioned their own expert report to analyze MET13's proposed purchases; and where MEP, not the SGM Parties, was the manager of both MET13 and Reed. Moreover, the inference of any scienter is belied by the fact that there were investments made by certain SGM Parties in MET13 or Reed.

**Counsel's Recent Papers in this Court**

180.    Counsel continue to repeat false factual allegations that are contained in their pleadings, and to make false factual allegations that Counsel fail to withdraw even after disproven.

181.    After SGM Parties moved to dismiss <u>DNV v. SGM</u> for, among other things, lack of standing, Counsel sought to manufacture direct injury and standing by re-characterizing the Complaint, and advising the Court that "[DNV] Plaintiffs' lawsuit is based entirely upon the [SGM Parties'] unlawful conduct [prior to DNV Plaintiffs' investment]" and "[DNV] Plaintiffs' injuries occurred prior to their status as limited partners."

182.    Counsel's concession that Passive Investors have no claims for activity after they invested in December 2011 highlights the lack of merit of the claims against the SGM Parties, as no acquisitions were made by Reed or its affiliates until 2012, and no direct or indirect damages

were incurred or could have been incurred at the time Passive Investors invested, since MET13's sole assets were Passive Investors' investments.

183.     Counsel's concession also appears to eliminate the already tenuous claim that Passive Investors might somehow be held liable for an estimated $3 million to cap wells and clean up the Shallow Operation.

184.     Counsel's concession also eliminates any basis or reason for many or most of the inflammatory and false allegations of fraud and conspiracy that permeate the Complaint. But Counsel refuse to dismiss these irrelevant and outrageous factual claims, let alone the baseless legal claims.

185.     Counsel also falsely assert in recent papers, seeking to avoid dismissal, that the GSA is invalid because it supposedly was not executed by MET13 or MEP.

186.     Counsel's claim that GSA was not fully executed is false and intended to deceive the Court. Counsel's claim is also directly contradicted by their own allegations in the Complaint that **"Metropolitan . . . signed the agreement**." (Compl. ¶ 110 (emphasis supplied).)

187.     The claim is also inconsistent with Counsel's argument that the reason for the lack of specificity in the Complaint, supposedly, was that they were unable to conduct due diligence because "[t]he attorney representing Metropolitan and its employees informed me that "**because Metropolitan had signed a Global Settlement Agreement**" he would not speak with Mr. Andrews. (DNV v. SGM, Decl. of A. James Andrews dated July 15, 2014 ¶ 5); see DNV v. SGM, Memo in Opp. to Motion to Dismiss at 16 (same) (emphasis supplied.).

188.     On information and belief, Counsel's belated claim that the GSA was not fully executed is an attempt to deceive this Court, and to collaterally attack the decisions of Justice

Sherwood and Judge Lipman enforcing the GSA, including Judge Lipman's order finding that Passive Investors are bound by the GSA, including its venue provisions.

189.     The apparent basis for Counsel's claim about the missing signature in the GSA was a minor copying error: one of the multiple counterpart signature pages to the GSA was not copied when the GSA was filed as an exhibit, and a blank unsigned page was included in error. Promptly after Counsel raised the argument that the GSA supposedly was not fully executed, the copying error was promptly corrected. (DNV v. SGM, D.E. 66-3.) Despite this correction, and despite Counsel's knowledge that the GSA was fully executed, Counsel has failed and refuse to withdraw, correct, or modify this deceptive claim or withdraw this defense to the motion to dismiss.

190.     In Counsel's opposition to the motion to dismiss in DNV v. SGM, Counsel also falsely imply to the Court that SGM Parties currently are facing criminal prosecution. Counsel state: "Should the Court take the view that the [DNV] Plaintiffs' RICO action will only become ripe after the Defendants have been criminally convicted, the [DNV] Plaintiffs respectfully request that the Court make any dismissal without prejudice to their rights so that the [DNV] Plaintiffs will have an opportunity to bring a future civil RICO action should the Defendants be convicted criminally." (Memo in Opp. to Motion to Dismiss at 15 n.3.)

191.     Counsel have no basis or reason to imply to the Court that the SGM Parties will be criminally convicted. There is no pending criminal investigation, let alone any pending criminal prosecution. Counsel had no substantial purpose to say this other than to seek to deceive the Court, and to seek to embarrass, harm, and perhaps threaten the SGM Parties.

192.     Counsel also make up facts to try to create claims. For example, Counsel allege in the Complaint that Counsel seek an "Order requiring the Defendants to assume financial

responsibility for the wells it fraudulently induced Met13 (class members) to purchase." (Compl. ¶ 149.) Counsel make this allegation despite knowing that it is false, since neither MET13 nor Passive Investors purchased a single well.

193. Counsel know that they should never have sued any of the SGM Parties, let alone made factual misstatements to do so, because Counsel are aware that Passive Investors and the putative class members have no direct claims, and that all claims by MET13 and its affiliates were released in the GSA. (See Compl. ¶ 111.)

194. As a result of Counsel's past and continuing misconduct, including the assertion of claims predicated on false statements of fact, seeking many tens of millions of dollars in damages against innocent parties, and against parties who had absolutely no involvement in the Oil and Gas Transactions, SGM Parties have suffered and are continuing to suffer substantial damages, including six-figure legal fees and other damages, including reputational harm.

195. N.Y. Judiciary Law § 487 is intended to prevent such abuse of the judicial system, including, paradigmatically, lawsuits based on knowingly false statements of fact to create claims as against defendants who had no involvement in the transactions in dispute. This case fits squarely within that paradigm.

196. Counsel's misconduct violates N.Y. Judiciary Law § 487 under any applicable standard; Counsel's misconduct also should be reviewed in light of their statements in pleadings that they are "counsel competent and experienced in complex class action litigation," and that "two of [DNV] Plaintiffs' attorneys have already been found to have the requisite knowledge and experience in final orders approving other class action certifications/settlements." (Compl. ¶ 144.)

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, SGM Parties, respectfully demand judgment against

defendants, A. James Andrews, Richard Gaines, and Karl Schledwitz, jointly and severally, in

such amounts as may be determined at trial, trebled pursuant to N.Y. Judiciary Law § 487,

together with interest, expenses, and costs, and such other and further relief as this Court may

deem just and proper.


Dated:  New York, New York
        October 15, 2015

                                        **THE SCHULMAN LAW FIRM LLP**


                                        By:  /s/Dan J. Schulman
                                             Dan J. Schulman
                                             *Attorneys for Plaintiffs*

                                        11 Broadway, Suite 615
                                        New York, New York 10004

                                        Tel: (646) 688-5214
                                        Fax: (646) 304-1117
                                        Email: djs@djslf.com