UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

SGM HOLDINGS LLC, SYNDICATED GEO
MANAGEMENT CORPORATION, RICHARD
FEATHERLY, LAWRENCE FIELD, and
PREMIER NATURAL RESOURCES LLC,

        *Plaintiffs,*

       *-against-*

A. JAMES ANDREWS, RICHARD GAINES,
and KARL SCHLEDWITZ,

        *Defendants.*

--------------------------------------------------------X

15 Civ. 8142 (PAC) (HBP)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiffs Charles Stephenson, on his own behalf and as assignee of all claims of former

plaintiffs SGM Holdings LLC ("SGM"), Syndicated Geo Management Corporation, Richard

Featherly, and Premier Natural Resources LLC (collectively, "Plaintiffs") bring this action against

Defendants A. James Andrews, Richard Gaines, and Karl Schledwitz (collectively, "Defendants")

pursuant to New York Judiciary Law § 487 based on allegedly deceitful statements made to this

Court in *DNV Investment Partnership v. SGM Holdings LLC*, No. 15 Civ. 1255 (S.D.N.Y.).

Having completed discovery, the parties have both moved for summary judgment pursuant to

Federal Rule of Civil Procedure 56. The Court **DENIES** both motions.

## BACKGROUND

    This case arises from a botched joint venture to purchase and redevelop several oil and gas

wells. The botched joint venture resulted in a litigation (the "DNV Action"), whereby a set of

investors (represented by Defendants here) sued its joint venturers (Plaintiffs here) for fraud. *DNV*

*Inv. P'ship v. Field ("DNV V")*, No. 15 Civ. 1255, 2020 WL 2539029, at *1 (S.D.N.Y. May 19,

2020).[1]   On May 19, 2020, this Court granted defendants' motion for summary judgment, terminating the DNV Action. *Id.* at *9.  Plaintiffs now bring this action pursuant to New York Judiciary Law § 487 alleging that Defendants knowingly made false and deceptive statements to this Court during the prior DNV Action. Pls.' Mem. Law Sup. Pls.' Mot. Summ. J. ("Pls.' Mem.") 1, ECF No. 96.

Because this case arises in connection to the DNV Action, the Court briefly recounts the transaction and alleged fraud underlying the DNV Action, relying on the record in this case and the Court's prior opinion granting summary judgment to the defendants (the "DNV Defendants").

## I.   DNV Action

### A.  The Parties to the Underlying Joint Venture

Plaintiff Richard Featherly was the President of Plaintiff Syndicated Geo Management Corporation ("Syndicated Geo"), and then manager of SGM Holdings, LLC ("SGM"). Pls.' Rule 56.1 Statement Material Fact ("Pls.' SOF") ¶ 38, ECF No. 97.  He also served as the initial president of Reed. *Id.*

Syndicated Geo entered a letter agreement with Regent Private Capital, LLC ("Regent") which was run by Lawrence Field, to act as Syndicated Geo's agent in obtaining financing. LaMons Decl. Ex. 53 ("Field Decl.") ¶¶ 17–18.  Regent described itself as a joint family office of the Charles Stephenson and Lawrence Field families. *DNV V*, 2020 WL 2539029, at *1. Stephenson is the chairman of the board of Premier Natural Resources, LLC ("Premier"), an Oklahoma-based oil and gas exploration company. *Id.*

---

[1] Generally, if the Court refers to a document in the record as "ECF No. __", it refers to the docket in this present case, *SGM Holdings LLC v. Andrews*, No. 15 Civ. 8142 (filed October 15, 2015). If the Court refers to a document on the docket for *DNV Investment Partnership v. SGM Holdings LLC*, No. 15 Civ. 1255 (S.D.N.Y.) (filed Apr. 2, 2014) ("DNV Action"), the document is labeled "*DNV Action*, ECF No. __."

The joint venture also involved a private equity firm called Metropolitan Equity Partners ("MEP") and its managing partner, Paul Lisiak. *Id.* MEP was the manager and founder of Metropolitan EIH13, LP ("Met13"), a partnership and fund created specifically to raise capital for the joint venture. *Id.* at *2.

**B. The Joint Venture**

In 2011, Syndicated Geo, through its agent Regent, sought financing to pay for the acquisition and development of oil and gas fields.[2] Pls.' SOF ¶¶ 1–2. Lawrence Field, the founder and director of Regent, introduced the investment opportunity to private equity firm MEP. *DNV V*, 2020 WL 2539029, at *1.[3] Ultimately, Regent brokered a deal where MEP and SGM would jointly own and manage the oil and gas fields. *Id.* at *2.

To finance the deal, MEP formed a new limited partnership and raised a new fund called "Met13." *Id.* Additionally, MEP formed a subsidiary for the joint venture named Reed Energy LLC ("Reed"). *Id.* Met13 intended to use the capital it raised to lend money to Reed at a 20% interest rate. *Id.* In return for the capital, Reed would acquire drilling rights from SGM. *Id.* The proposed ownership of Reed was: Met13—52%, SGM—40%, Regent—6%, and MEP—2%. *Id.* Reed was to be managed by two representatives of MEP and two representatives of SGM, including Lisiak and Featherly. *Id.*

---

[2] The oil and gas fields at issue include aging oil and gas wells in Ohio, West Virginia, and Pennsylvania (the "Shallow Operations") and mineral mining rights in the Utica Shale (the "Deep Rights"). Pls.' SOF ¶¶ 1–3.

[3] Syndicated Geo was unable to obtain financing, and thereafter became inactive. LaMons Decl. Ex. 52 ("Featherly Decl.") ¶ 13, ECF No. 99. Subsequently, Featherly founded SGM which obtained purchase contracts and options for oil and gas properties. *Id.* ¶ 14. Ultimately, SGM (not Syndicated Geo) and MEP worked together to develop the rights. *Id.* ¶ 16.

The joint venture did not go well.  Shortly after the project was funded, natural gas prices tanked to a 10-year low, substantially reducing the value of the oil and gas fields.  *Id* at *5. Moreover, the operations were in disrepair and required extensive investment to become productive. Pls.' SOF ¶¶ 18–29.  In the end, the Met13 investors lost millions.  *See* LaMons Decl. Ex. 36 ("Third Amended Complaint") 2.  The crux of the DNV Action was that Featherly, Field, their subsidiaries, and several others, perpetrated a fraud on Met13 to induce them into investing in nonproductive wells.

### C. The Alleged Fraud in the DNV Action

The heart of the alleged fraud in the DNV Action concerned due diligence notes prepared by Bayswater Exploration and Production (Bayswater).  Months before the deal closed, Field introduced Bayswater as a potential candidate to operate the Shallow Operation in Ohio. *DNV V*, 2020 WL 2539029, at *2.  On June 7, 2011, Lisiak and Featherly accompanied Bayswater on a one-day trip to see the Shallow Operation. *See id.*  Following the trip, Bayswater sent an email to Lisiak indicating that the Shallow Operation did not conform to the upside quantified by previous reports. *Id.*  However, on June 13, 2011, Bayswater separately sent an email to Field containing due diligence notes which detailed Bayswater's concerns with the operation. *Id.*  These due diligence notes were not sent to Lisiak for several months. *Id.*  When Field eventually sent the notes to Lisiak, several of Bayswater's specific concerns were removed. *Id.*  Plaintiffs in the DNV Action contended that had they "known of the negative information removed from the trip notes they would not have invested in Met13." *Id.* at *7.

This Court granted summary judgment for defendants (Plaintiffs here) finding, in pertinent part, that MEP could not have reasonably relied on the purported omissions from the Bayswater

notes. *Id.* at *9. The Court found that MEP ignored multiple diligence reports[4] "indicating that the Shallow Operation was in disrepair," that the "existing wells were largely nonproducing," and that the value of the income from the existing wells was negligible "and possibly a liability." *Id.* Due to MEP's failure to avail itself of this information, this Court held MEP "could not have justifiably relied on alleged misrepresentations and omissions by Defendant Field as a matter of law." *Id.*

## II.    **The Instant Suit**

Plaintiffs here allege that Defendants' conduct as attorneys in the DNV Action violated New York Judiciary Law § 487, causing them damages in the form of attorneys' fees and expenses. Plaintiffs aver that the Defendants intentionally deceived Plaintiffs and this Court by: (1) suing individuals and entities whom Defendants knew were uninvolved with the underlying transaction; (2) conflating entities Defendants knew were distinct; and (3) fabricating allegations that the

---

[4] MEP had access to multiple diligence reports warning of the risks of the Shallow Operation.

First, a Met13 partner commissioned an expert report on the Shallow Operation by the John T. Boyd Company ("Boyd Report"). Pls.' SOF ¶ 18. The Boyd Report warned that the "[e]xisting wells in the shallow gas formation are largely nonproducing or have minimal production." *DNV V*, 2020 WL 2539029 at *3.

Second, all MEP parties had access to the Phase I Environmental Site Assessment of the Shallow Operation prepared by TEEMCO, LLC ("TEEMCO Report"). Pls. SOF ¶¶ 22–23. The TEEMCO Report indicated that of the 143 wells at the Shallow Operation, 30 wells were missing, and 79 others had serious environmental problems that required remediation. *Id.* ¶ 24.

Third, MEP conducted their own evaluation and drafted the Confidential Disclosure Memorandum ("CDM") on December 15, 2011, which was distributed to investors. *DNV V*, 2020 WL 2539029 at *3. The CDM indicated that "a small portion of the 171 wells are not fully functioning and the remainder are producing at sub-standard production levels due to a lack of ongoing investment in required capital expenditures and proper maintenance." *Id.* The CDM further warned investors that "[t]here is a possibility you will lose all or substantially all of your investment." *Id.* at *4.

Met13 Investors had no knowledge of the deficiencies in the Shallow Operations and the Deep Rights.

## A. Uninvolved and Conflated Defendants

Plaintiffs claim that Defendants intended to deceive Plaintiffs and this Court by suing Premier, Charles Stephenson (Premier's chairman), and Syndicated Geo, despite Defendants' knowledge that all three were not involved in the underlying transaction. Pls.' Mem. 10. Plaintiffs point to several instances where Defendants acknowledge that these parties had no financial interest in the transactions nor any contacts with Met13 investors. For example, in Defendants' response to Plaintiffs' request for admissions, Defendants admit that Charles Stephenson never spoke with any Met13 Partners nor had any interest in the relevant transactions. LaMons Decl. Ex. 57 ("Defs.' Admissions") ¶¶ 82–89. Premier and Syndicated Geo's connection with the DNV Action is equally tenuous. *See e.g.,* *id.* ¶ 154 ("Admitted that no DNV Plaintiff ever spoke with either of the entities that have been referred to as, SGM"); ¶¶ 75–90 (admitting that Premier was not a party to the transactions, nor had any contract with Met 13, Reed, or related entities). Despite these admissions, Defendants, in a series of amended complaints with a roaming array of defendants, continued to sue Premier, Stephenson, and Syndicated Geo. *See* LaMons Decl. Ex. 65 (setting forth a table of Defendants' six amended pleadings in the DNV Action with corresponding parties). Plaintiffs claim that pursuing this course of action, despite the knowledge that none of the defendants were engaged in the transaction, is actionable deceit under § 487.

Plaintiffs further claim that Defendants engaged in intentional deception by representing that distinct parties were the same. For example, it is undisputed that Defendants frequently referred to Regent and Premier as one entity, even though they are legally distinct. *See* Pls.' SOF ¶¶ 128–129. Defendants did the same with regards to SGM Holdings and Syndicated Geo. *Id.* ¶¶

130–131. Plaintiffs aver that Defendants pursued this course, despite their knowledge to the contrary, to invent a conspiracy to bolster their fraud allegations. Pls.' Mem. 22. They claim that such knowing deception violates § 487.

### B. Knowledge of the Deficiencies

Plaintiffs further allege that Defendants knowingly engaged in deception by falsely alleging that its clients would not have invested in the Shallow Operation but for Plaintiffs' misrepresentations and omissions. Pls.' Mem. 15. Plaintiffs claim that this argument rests on the false premise that Defendants' clients had no knowledge of the tattered condition of the Shallow Operation prior to investing in Met13. *Id.* As this Court noted in its summary judgment opinion, the record is clear that the Met13 investors had ample notice as to the Shallow Operation's disrepair. *DNV V*, 2020 WL 2539029, at *3. It is undisputed that all Met13 partners had read and relied on the CDM, which Defendants attached to the pleadings. *See* Second Am. Compl. ¶ 52, *DNV Action*, ECF No. 22; Third Am. Compl. ¶ 75, *DNV Action*, ECF No. 98. Further, the Met13 investors ignored the warnings of the Boyd and TEEMCO Reports. Plaintiffs aver that it was intentionally deceptive for Defendants to feign ignorance of the risks of the joint venture in light of the various reports within Defendants possession.[5]

Plaintiffs also argue that Defendants intentionally deceived Plaintiffs and this Court by blaming Plaintiffs' for MEP's losses attributed to the Deep Rights. Plaintiffs argue that Defendants knew that $39.5 million was invested in Met13, but only roughly $4 million was used to acquire

---

[5] Plaintiffs also take issue with claims related to Class B investments in Met13, which Defendants added in their Third Amended Complaint. Pls.' Mem. 17. Defendants contended that the Supplemental CDM issued in connection with the Class B investment round "incorporated the fatally flawed CDM and thereby suffered from the same acts and omissions." *Id.* at 18. Plaintiffs claim this intentionally deceived the Court because the Supplemental CDM concerned only "Deep Right that Reed had located and on which Reed had conducted all diligence" and therefore was entirely distinct from the alleged fraud concerning the Shallow Operation. *Id.* at 17.

and operate the Shallow Operation. Pls.' SOF ¶¶ 97–98. Plaintiffs further argue that the options

and interests in the Deep Rights were entirely controlled by MEP, not Plaintiffs. *Id.* at ¶ 100.

Plaintiffs claim that it was intentionally deceptive to blame Plaintiffs for the failed investments in

the Deep Rights controlled entirely by Defendants.

## DISCUSSION

### I.   Applicable Standards

Summary judgment is appropriate where the movant shows there is no genuine dispute as

to any material fact and the movant is entitled to judgement as a matter of law. *See* Fed. R. Civ.

P. 56(a). The moving party bears the initial burden of producing evidence on each material element

of its claim or defense demonstrating that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). The Court resolves all ambiguities and draws all factual inferences in favor

of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550

U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). To defeat summary judgment, the nonmoving

party cannot rely merely on "conclusory allegations or unsubstantiated speculation." *Jeffreys v.*

*City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Instead, the nonmoving party must point to

concrete "evidence on which the jury could *reasonably* find for the [nonmovant]." *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If there are cross-motions for

summary judgment, the Court must assess each of the motions and determine whether either party

is entitled to judgment as a matter of law. *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461

(2d Cir. 1993).

Plaintiffs allege violations of New York Judiciary Law § 487, a New York statute

governing attorney conduct. Section 487 of the New York Judiciary Law provides in relevant part

that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion,

with intent to deceive the court or any party . . . forfeits to the party injured treble damages, to be recovered in civil action." N.Y. Jud. Law § 487.  To establish a claim under § 487, a plaintiff must show that defendants: "(1) are guilty of deceit or collusion, or consent to any deceit or collusion; and (2) had an intent to deceive the court or any party." *Iannazzo v. Day Pitney LLP*, No. 04 Civ. 7413, 2007 WL 2020052, at *11 (S.D.N.Y. July 10, 2007).  "[T]he central question in a section 487 action is . . . whether the false statements were made 'intentionally.'" *Hansen v. Miller*, 52 F.4th 96, 102 (2d Cir. 2022) (quoting *Amalfitano v. Rosenberg*, 903 N.E.2d 265 (N.Y. 2009) (alteration omitted).  In addition, a plaintiff must establish damages caused by the deceit. *See Feldman v. Jasne*, 742 N.Y.S.2d 540 (N.Y. App. Div. 1st Dep't 2002).

Section 487 limits liability to deception which is "extreme" or "egregious." *See Ray v. Watnick*, 182 F. Supp. 3d 23, 29 (S.D.N.Y. 2016), *as amended* (May 3, 2016), *aff'd*, 688 Fed. Appx. 41 (2d Cir. 2017) (collecting cases).  "By confining the reach of the statute to intentional egregious misconduct, this rigorous standard affords attorneys wide latitude in the course of litigation to engage in written and oral expression consistent with responsible, vigorous advocacy, thus excluding from liability statements to a court that fall 'well within the bounds of the adversarial proceeding.'" *O'Callaghan v. Sifre*, 537 F. Supp. 2d 594, 596 (S.D.N.Y. 2008) (quoting *Lazich v. Vittoria & Parker*, 592 N.Y.S.2d 418, 419 (N.Y. App. Div. 2d Dep't 1993).  "Under this threshold, an action grounded essentially on claims that an attorney made meritless or unfounded allegations in state court proceedings would not be sufficient to make out a violation of § 487." *Id.*

## II.   **Plaintiffs' Motion Fails**

Plaintiffs' motion fails because there is a genuine dispute of material fact as to whether Defendants intended to deceive the Court.  Liability under § 487 requires intentional deceit.

*Hansen*, 52 F.4th at 102. "[T]he statute does not extend to negligent acts or conduct that constitutes only legal malpractice, evincing a lack of professional competency." *Bill Birds, Inc. v. Stein L. Firm, P.C.*, 149 N.E.3d 888, 891 (N.Y. 2020). In other words, to prevail on summary judgment, Plaintiffs must do more than show that Defendants were sloppy; they must allege facts which conclusively demonstrate scienter. *Hansen*, 52 F.4th at 102. Summary judgment is a tool ill fitted for the task, as questions of intent are factual in nature. *Trepel v. Dippold*, No. 04 Civ. 8310, 2006 WL 3054336, at *4 (S.D.N.Y. Oct. 27, 2006) ("Summary judgment is generally inappropriate where questions of intent and state of mind are implicated.").

Here, Plaintiffs fail to establish scienter as a matter of law. Plaintiffs essentially aver two categories of deceit. First, they claim that Defendants intentionally obscured the parties, both by suing entities which were uninvolved in the underlying transaction and by conflating entities Defendants knew were distinct. Second, Plaintiffs claim that Defendants lied when they argued that their clients were unaware of the risks of the joint venture because reports prepared by Defendants acknowledged these very risks. The evidence provided by Plaintiffs could well lead a reasonable juror to conclude that Defendants acted with intent to perpetuate an extreme pattern of legal delinquency. But this evidence is not enough to make that conclusion as a matter of law.

First, Defendants renounce any intent to deceive regarding the identity of the parties. The Defendants' testimony indicates that they believed the DNV Defendants were members of a conspiracy, working to help Field defraud the Met13 investors. For example, Andrews testified that the Met13 investors "had been told by Lawrence Field that Premier had done over a million dollars' worth of diligence on this oil field, and that Premier and Regent were one and the same and different in name only." LaMons Decl. Ex. 59 ("Andrews Dep.") at 214:14–18. Andrews further testified that he believed that Stephenson's shifting corporate entities and involvement in

Regent indicated fraud and a desire to cover up his role in this alleged conspiracy. *Id.* at 242:20–244:5. As for Gaines, he testified that Defendants "were constantly trying to be as accurate as possible. In that attempt, if we felt like a party did not belong in the lawsuit, we would take them out of the lawsuit." LaMons Decl. Ex. 60 ("Gaines Dep.") at 67:5–8. He also stated that "there's no hesitation in my mind that fraud indeed occurred here. What precise parties were responsible for the fraud is up to debate to some extent, I think, but we were attempting to find those parties and make our clients whole." *Id.* at 99:25–100:5. Putting aside the legal validity of these arguments, the attorneys' testified belief that they were pursuing a fraudulent conspiracy—however meritless—creates a genuine dispute of material fact as to their intent to deceive and renders the case inappropriate for summary judgment.

Plaintiffs claim that an email dated November 11, 2013 from Dale Menard (a plaintiff in the DNV Action) to Paul Lisiak demonstrates intentional deception. LaMons Decl. Ex. 16. In the email, Menard writes "Jim[ Andrews's] suggestion of the potential for a RICO law violation is worth exploring. I would think that the threat of KKR finding out of Field's unauthorized and illegal involvement with Reed might bring him and his father-in-law to a settlement discussion." *Id.* Reading this email in the light most favorable to the Plaintiffs, one could infer that Defendant Andrews intended to harass innocent defendants into a settlement. However, reading the email in the light most favorable to Defendants, the Court notes that Andrews is not a participant in the email exchange, and he disavowed knowledge or belief of this strategy in his deposition. *See* Andrews Dep. at 54:3–56:7. As such, the email's probative value on intent remains a triable issue of fact.

There is likewise a genuine issue of fact regarding whether Defendants intended to deceive the Court by claiming that its clients were unaware of the risks of the joint venture. Plaintiffs cite

to several documents (including the Boyd Report, the TEEMCO Report, and the CDM) that Defendants had in their possession throughout the litigation that state facts contrary to those alleged by Defendants.   While these documents are certainly probative of intent, they are not definitive.   They are, for example, potentially probative of Defendants' negligence in failing to fully review the documents before relying on them in Court.[6]   Negligence, even the filing of frivolous lawsuits, is insufficient to establish liability under § 487.   *See Bill Birds*, 149 N.E.3d at 891.   Without more, the Court cannot infer Defendants' intent regarding these allegations on summary judgment.

Finally, the Court notes that Plaintiffs' reliance on *Amalfitano v. Rosenberg* is misguided. 428 F. Supp. 2d 196 (S.D.N.Y. 2006), *aff'd*, 572 F.3d 91 (2d Cir. 2009).   As a threshold matter, *Amalfitano* was decided following a bench trial where the court made factual determinations with respect to the defendant's intent and credibility.   By contrast, here, on a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence" as these are "jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).   Therefore, the court's analysis in *Amalfitano* blends the law with factual determinations, which the Court cannot do at this stage.

Further, *Amalfitano* is distinguishable on the merits.   In *Amalfitano*, the court found that a defendant attorney, Rosenberg, violated § 487 by, among other things, suing a party he knew was no longer a partner to the business at issue. *Amalfitano*, 428 F. Supp. 2d at 201.   Here, Plaintiffs contend that just as Rosenberg was held liable for suing a party he knew was not involved in the suit, Defendants should be liable for suing parties they knew were uninvolved in the underlying

---

[6] Indeed, the fact that the attorneys submitted these documents to the Court multiple times during the DNV Action evinces a lack of attempt to conceal them.

transaction. Pls.' Mem. 8. But the requisite knowledge is substantially different in the two cases. In *Amalfitano*, Rosenberg "was intimately involved in the negotiations which led to the drafting of the agreement" which terminated the party's interest in the business. *Amalfitano*, 428 F. Supp. 2d at 208. Nonetheless, Rosenberg sued the party as a partner in the business. The court specifically noted that had "Rosenberg's representation of [the party] commenced with the filing of the [subsequent] litigation, Rosenberg's actions might demonstrate a lack of competence, common sense, or rationality." *Id.* Here, Defendants did not have analogous first-hand knowledge of the identity of the parties. A reasonable juror could conclude that Defendants acted in good faith to pursue a complex conspiracy in an effort to make their clients whole, or merely infer that Defendants were incompetent. Given these issues of fact, summary judgment is inappropriate.

In sum, there are genuine disputes of material fact as to whether Defendants intended to deceive this Court and Plaintiffs in the DNV Action. Plaintiffs have adduced evidence that could lead a reasonable juror to conclude that Defendants acted with intent to perpetrate an extreme pattern of legal delinquency actionable under § 487. But Defendants' actions could just as well bespeak negligence. As such, triable issues of fact remain for the jury. The Court therefore **DENIES** Plaintiffs' motion for summary judgment.

## III.   **Defendants' Motion Fails**

Defendants have cross moved for summary judgment on the issue of intentional deceit pursuant to New York Judiciary Law § 487. For the same reasons discussed *supra*, Defendants motion fails. In short, Plaintiffs have adduced sufficient evidence from which a reasonable juror could determine that Defendants engaged in a pattern of egregious misconduct in violation of

§ 487.[7]  Because factual issues related to intent exist, Defendants are not entitled to summary judgment.

In addition to challenging the merits of Plaintiffs' § 487 claim, Defendants raise several defenses to Plaintiffs' action.  As provided below, the Court finds them all to be without merit.

## A. Extraterritoriality and Standing

Defendants argue that they are entitled to summary judgment based on the territoriality of the claim.  It is well settled that § 487 does not "apply extraterritorially."  *Nardella v. Braff*, 621 F. Supp. 1170, 1172 (S.D.N.Y. 1985) (citing *Schertenleib v. Traum*, 589 F.2d 1156, 1166 (2d Cir. 1978)).  Here, Defendants argue that because they filed the DNV Action in the Middle District of Tennessee, any alleged misconduct occurred outside New York, barring Plaintiffs' claim.  This argument fails.  The DNV Action was only briefly filed in Tennessee, and Judge Lipman promptly deemed its presence in her court improper.  *See DNV Inv. P'ship v. SGM Holdings LLC ("DNV I")*, No. 14 Civ. 2232, 2015 WL 11181736, at *8 (W.D. Tenn. Feb. 13, 2015).  Plaintiffs' numerous allegations of misconduct occurred after the case was transferred to this Court, so the territorial nature of § 487 does not bar recovery.

Defendants' standing argument also fails.  Defendants allege that Plaintiffs lack standing to recover under § 487 because they are not Defendants' clients.  This argument is inconsistent with the clear language of the statute, which "requires an intent to deceive '*any party*' and provides for treble damages for 'the party injured.'"  *Trepel v. Dippold*, No. 04 Civ. 8310, 2005 WL

---

[7] Defendants argue that, in particular, Defendant Schledwitz could not be found liable because of his lack of involvement in the case.  The Court disagrees.  Schledwitz appeared multiple times in the DNV Action, promoted untenable theories of fraud in those filings, and at minimum consulted with Andrews and Gaines on the strategy of the litigation towards the beginning of the case.  This is sufficient to create a genuine dispute of material fact as to his conduct, and summary judgment must be denied.

1107010, at *5 (S.D.N.Y. May 9, 2005) (emphasis in original) (quoting N.Y. Jud. Law § 487).

Multiple courts in this district have allowed recovery in litigation from opposing parties. *See, e.g.*,

*id.*; *Amalfitano*, 428 F. Supp. 2d 196.  Accordingly, the Court finds Plaintiffs have standing to

bring this suit.[8]

### B. The *Noer-Pennington* Doctrine Does Not Apply

Defendants also argue that their conduct was protected by the *Noerr-Pennington* doctrine.

*See Mine Workers v. Pennington*, 391 U.S. 657 (1965).  The *Noerr-Pennington* doctrine protects

the First Amendment right to "petition the government for governmental action, including through

litigation and activity incidental to litigation." *New York v. N. Leasing Sys., Inc.*, 193 A.D.3d 67,

69 (N.Y. App. Div. 1st Dep't 2021).  However, the doctrine has a "sham" exception which

"'excludes any abuse of process that bars access to the courts,' including 'unethical conduct in the

setting of the adjudicatory process or the pursuit of a pattern of baseless, repetitive claims.'" *See*

*Michelo v. National Collegiate Student Loan Trust 2007-2*, 419 F.Supp.3d 668, 694 (S.D.N.Y.

2019) (quoting *Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 475-76 (S.D.N.Y. 2013)).

Given that Plaintiffs allege that Defendants have indeed filed "baseless, repetitive claims", the

Court finds Defendants' argument to be without merit. *See Sykes v. Mel Harris & Assocs., LLC*,

757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010).

### IV.   Defendants' Other Motions are Denied

---

[8] Defendants cite two cases, *Lipin v. Hunt*, No. 14 Civ. 1081, 2015 WL 1344406 (S.D.N.Y. Mar. 20, 2015) and *Rogath v. Koegel*, No. 96 Civ. 8729, 1998 WL 695668 (S.D.N.Y. Oct. 6, 1998), to bolster their argument against standing.  Neither case saves their motion.  First, *Rogath* dismisses the Section 487 claim along with a handful of legal malpractice claims in a footnote. *See Trepel*, 2005 WL 1107010, at *5 (finding standing and distinguishing *Rogath*).  Second, *Lipin* only relies on *Rogath*, and therefore does not grapple directly with the statutory language.  Finally, the Second Circuit has permitted adversarial parties to recover under § 487. *See Amalfitano v. Rosenberg*, 572 F.3d 91 (2d Cir. 2009) (affirming an award to adversarial party under § 487).  The Court therefore finds *Lipin* and *Rogath* unpersuasive.

The Court briefly addresses Defendants three motions and promptly dismisses them as non-justiciable or untimely.

First Defendants move "to deem statements admitted" about whether Plaintiffs' counsel still represents Field. On May 25, 2023, the Court granted a motion from Plaintiffs' counsel to withdraw as Field's attorney. ECF No. 115. Defendants' request is therefore moot and the Court will not address it.

Second, the Court denies Defendants' motion for a more definitive statement pursuant to Federal Rule of Civil Procedure 12(e) as untimely. *See FRA S. p. A. v. Surg-O-Flex of Am., Inc.*, 415 F. Supp. 421, 427 (S.D.N.Y. 1976). It is clear from the Federal Rules of Civil Procedure that a Rule 12(e) motion "must be made before filing a responsive pleading and must point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e). This makes sense, as a 12(e) motion may only be granted where a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." *Id.*; *see also Jaddo v. Town & City of Stamford, Connecticut*, No. 21 Civ. 350, 2022 WL 2168077, at *2 (D. Conn. June 16, 2022). Defendants' motion is therefore improper.

Finally, the Court denies without prejudice Defendants' motion in limine as premature. "Generally, courts have declined to reach the merits of motions *in limine* at a summary judgment setting." *Senior by Senior v. Eihab Hum. Servs., Inc.*, No. 15 Civ. 1009, 2019 WL 8128563, at *4 (E.D.N.Y. Oct. 10, 2019) (collecting cases). Defendants articulate no compelling reason for the Court to depart from this practice, and therefore the Court declines to address the motion on the merits. Should the parties proceed to trial, Defendants may renew their motion at that time.

## CONCLUSION

Both motions for summary judgment are **DENIED**.   Defendants' motions to deem statements admitted and for a more definitive statement are **DENIED**.   Defendants' motion in limine is **DENIED** without prejudice.   The parties are directed to submit a proposed date for a pre-trial conference within 14 days of this Order.   The Clerk of the Court is directed to terminate the motions at ECF Nos. 95, 102, 117.[9]

Dated:  New York, New York
       September 25, 2023

SO ORDERED

HONORABLE PAUL A. CROTTY
United States District Judge

---

[9] The motion to strike at ECF No. 117 was filed in response to an unsolicited letter from Plaintiffs filed on July 28, 2023, in which counsel appears to attempt a supplement to the record on summary judgment.  Neither submission was filed with the Court's leave, and therefore the Court declines to address them.